[No. 39078. Department Two. March 14, 1968.]

SHIRLEY R. WATSON, *Respondent,* v. FRED YASUNAGA *et al., Appellants.*[*]

*Lee R. McNair,* for appellants.

*A. T. Wendells* (of *Wendells, Froelich & Power*), for respondent.

HUNTER, J.—This appeal is from a judgment rescinding a real estate contract on the ground of fraudulent misrepresentations made by the sellers' agent.

[*]Reported in 438 P.2d 607.

The defendants (appellants), Fred Yasunaga and Gloria S. Yasunaga, his wife, owned a 22-unit apartment building in Seattle, the Seafair Apartments, which they wished to sell. Fred Yasunaga called the office of Clifton Albright, Realtor, in April, 1964 and asked that the building be listed. The salesman he was talking to requested that Yasunaga furnish certain information about the income and expenses of the building. Yasunaga gave the requested information, with the caution that the figures were approximations. The salesman entered the figures on a form, which was presented as exhibit 2 at the trial.

The form was divided into two columns, one headed "Annual Expense" and the other headed "Monthly Income." The column for annual expense totaled to $3,820. Monthly income was listed at $1,550, totaling annually $18,600. Annual net income appeared as $14,780.

Miss Shirley R. Watson, the plaintiff (respondent), was interested in buying an apartment building. She contacted the Albright realty agency and was told about the Seafair Apartments. The broker not only furnished her with the information contained in exhibit 2, but he also gave her a copy of the form. The plaintiff decided to buy and signed an earnest money agreement on May 22, 1964.

On June 1, 1964, the plaintiff moved into the building and took over its management. She received a list of the tenants and the rents each was paying (exhibit 4 at the trial) from Yasunaga. It was evident from the list that in order for the building to produce $1,550 in rentals per month, all of the apartments would have to be occupied. The closing was held on June 12, 1964. At that time the building was fully occupied. However, during the remainder of that month, nine tenants moved out, six without paying any rent. The plaintiff was unable, thereafter, to keep the building filled. Her rent collections totaled $978.50 for July, 1964, $738 for August, and $983 for September, her last month in possession.

The plaintiff met with Fred Yasunaga and the broker in order to arrange a mutually satisfactory adjustment in the

transaction. This was unsuccessful and she turned the matter over to her attorney. His efforts to negotiate a settlement also failed. The plaintiff thereupon sent the defendants a rescission notice and tender of possession, dated September 24, 1964. The defendants declared a forfeiture of the real estate contract and the plaintiff brought this suit, seeking rescission of the contract and restitution of her $9,000 downpayment. The trial to the court resulted in a finding that the broker had made fraudulent misrepresentations and a judgment granting the plaintiff the relief she sought. The defendants appeal from the judgment.

The defendants first contend that the record does not support the trial court's findings of fact that (1) the representations in exhibit 2 were false, (2) the plaintiff was ignorant of their falsity, and (3) the plaintiff relied upon these representations.

The defendants assign error to finding No. 4, which reads:

> That information concerning the expense and income of the Seafair Apartments was furnished to plaintiff in the form of a listing sheet, a copy of which, Exhibit 2 in this cause, was physically delivered to the plaintiff by the said Mr. Noren. That the information on the said sheet included specific representations of fact concerning, among other things, the cost of fuel, the cost of gas, the cost of lights and the cost of management, all compiled on an annual basis. In addition, the said sheet contained representations of fact concerning monthly income from the property, annual income from the property, total annual expense, the annual net income, and the annual "cash flow" from the operation.

This finding is fully supported by the record.

The trial court's finding with respect to the falsity of the income figures appearing on exhibit 2 is as follows:

> That with respect to the income shown on Exhibit 2, the defendants had never since January 1, 1963, obtained $1,550.00 rental income, the actual amount thereof being approximately as follows according to the defendants' records:
> 
> | | |
> |---|---|
> | January, 1963 | $1,064.50 |
> | February, 1963 | 1,267.00 |

| | |
|---|---|
| March, 1963 | 1,505.00 |
| April, 1963 | 1,378.50 |
| May, 1963 | 1,168.51 |
| June, 1963 | 1,072.50 |
| July, 1963 | 1,306.00 |
| August, 1963 | 1,309.18 |
| September, 1963 | 1,139.92 |
| October, 1963 | 1,148.00 |
| November, 1963 | 1,069.25 |
| December, 1963 | 964.50 |
| January, 1964 | 963.50 |
| February, 1964 | 931.00 |
| March, 1964 | 623.50 |
| April, 1964 | 469.50 |

That the annual gross rental income was far below the figure of $18,600.00 represented on Exhibit 2. That the Seafair Apartments had never under the management of the defendants obtained a net income of $14,780.00 as represented by Exhibit 2, nor had the Seafair Apartments ever produced for the defendants a cash flow of $4,580.00. (Finding No. 6)

The record clearly supports this finding in every respect. The trial court also found that the annual expense figures appearing on exhibit 2 were understated:

That instead of an annual gas expense of $620.00 as represented by Exhibit 2, the gas expense for the calendar year of 1963 was $687.69 plus $65.00 rental charge, a total of $752.69, and a full year immediately prior to the date of the listing had even greater expense. Instead of $620.00 as represented in Exhibit 2, the fuel expense for the 1963 calendar year amounted to $907.01, and the charge for a full year immediately preceding the date of the listing was even higher. That the figure of $163.00 for electricity was approximately the correct figure for the one basic electricity bill to the building, but said figure ignores five other smaller accounts which were billed to the defendants and added to the electricity cost of the building. That instead of $600.00 per year, or $50.00 per month as represented in Exhibit 2, the defendants were obtaining management by rent reduction to three tenants, of a total of $58.00 per month, and the defendants were also living rent free in a $75.00 apartment to aid in the management, by virtue of which the management cost at the time of the sale was $133.00 per month. At the

monthly rate the cost of management would be $1,596.00 per year, but although this full amount appears not to have been spent in every month, management expense including the owners' apartment substantially exceeded the amount represented. (Finding No. 5)

This finding is also borne out by the record. There is no question that all of the income figures, and certain of the expense figures, on exhibit 2, are false insofar as they purport to represent actual amounts received and spent.

The defendants argue, however, that finding No. 7 is not supported by the record. It reads:

That the plaintiff purchased the Seafair Apartments in reliance upon the expense and income figures shown on Exhibit 2. That plaintiff was ignorant of the falsity of the representations thereon.

The defendants claim that the plaintiff knew that the figures on exhibit 2 represented the potential earnings of the building. This argument is based on exhibit 4. We cannot agree. Aside from the fact that the evidence shows that the plaintiff received exhibit 4 after she was committed to the purchase, exhibit 4 did not put her on notice that the building could not be expected to produce the income promised by exhibit 2. Exhibit 4 merely showed that all of the apartments were occupied and that the total rent, if all of the tenants paid, would approximate $1,550. It did not show that the experience of the prior owners had been that full occupancy had not been maintained and that the average monthly and yearly income fell well short of what was shown on exhibit 2. Nor that the rental income in April, 1964, the month when the building was listed and exhibit 2 was originally prepared, was only $469.50.

The trial court's findings that the representations in exhibit 2 were false, that the plaintiff was ignorant of the falsity of these representations, and that she relied on these representations, all being supported by substantial evidence in the record, will not be overturned by this court. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959).

■ The defendants' second contention is that the trial court erred in holding them accountable for misrepresentations made by the broker, Albright. They maintain that Albright was not expressly authorized to make the false representations, basing their argument on a finding to that effect entered by the trial court in the action on the third party complaint filed by the defendants against Albright. We do not decide whether that finding is conclusive as to the parties to the principal action, because, even if Albright lacked express authority to make the misrepresentations, the defendant sellers nevertheless are accountable for his actions on the basis of either implied or apparent authority. *Gnash v. Saari*, 44 Wn.2d 312, 267 P.2d 674 (1954). The facts in this record fully substantiate the trial court's conclusion that the defendants are liable for the fraudulent misrepresentations made to the plaintiff.

The judgment is affirmed.

FINLEY, C. J., HILL and NEILL, JJ., and EVANS, J. Pro Tem., concur.

———

May 2, 1968. Petition for rehearing denied.